LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170
Fasx: (702) 382-1169

Proposed Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>SPARTAN POOLS LLC,<br><br>Debtor. | Case No. 22-13244-nmc<br>Chapter 11 |

**OMNIBUS DECLARATION OF CARLOS TAPIA IN SUPPORT OF THE DEBTOR'S INITIAL EMERGENCY MOTIONS AND RELATED RELIEF**

I, Carlos Tapia, hereby declares as follows:

1. I am over the age of 18 and am mentally competent. I make this Declaration in support of the initial emergency motions requesting various types of immediate relief (collectively, the "Initial Motions") filed by Spartan Pools LLC, a Nevada limited liability company, as debtor and debtor in possession (the "Debtor"), in its chapter 11 bankruptcy case (the "Chapter 11 Case"), as well as such other relief as may be requested during the case.

2. I am the Debtor's sole Managing Member of its business. Based upon my positions and experience with the Debtor, I am readily familiar with its business, and operational and financial affairs. All facts set forth in this Declaration are based upon my own personal knowledge, or information learned from my review of relevant documents maintained in the ordinary course of the Debtor's business and which are business records. If called upon to testify as to the contents of this Declaration, I would do so as set forth herein.

3. This Declaration provides the Court with certain background information regarding the Debtor, as well as the context for various relief requested. Accordingly, the Declaration is organized into two parts: first, a brief overview of the Debtor its operations, organizational structure, and the events leading to its Chapter 11 Case, and second, an explanation of the relief sought in the Debtor's Initial Motions.[1] The relief sought in the Initial Motions is critical to the Debtor's operations, will allow for a smooth transition into chapter 11, and will help to ensure that the Debtor is provided the opportunity to reorganize successfully.

## I. Background

4. The Debtor is a Nevada limited liability company that specializes in swimming pool and spa construction, renovations, and repairs. The Debtor was formed on October 24, 2014. The Debtor is filing for bankruptcy reorganization principally to achieve a more economical and expedient resolution to an ongoing litigation in Nevada state court (the "Litigation"), which has proven very expensive and time consuming to litigate and resolve, and to allow Spartan to continue in business.

## II. Initial Motions

A. **Introduction.**

5. The Debtor's transition into Chapter 11 must be effectively organized to ensure that it will be able to operate smoothly in bankruptcy and be afforded the opportunity to successfully emerge from this Chapter 11 Case. Accordingly, it is critical that the Debtor maintains a strong relationship with its customer, vendors, creditors, and such other parties that enable the Debtor to conduct its business. To maintain these relationships, it is important to minimize the distractions to the Debtor's business operations that could result from petitioning for Chapter 11 relief.

6. I have reviewed and am generally familiar with the contents of each of the Initial Motions as hereinafter described. Based on that familiarity and information supplied to me by other members of the Debtor's legal advisors, I believe that the relief sought in each of the Initial Motions is necessary to enable the Debtor to operate in this Chapter 11 Case with minimal

---

[1] All capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the relevant Initial Motions, all of which are being filed contemporaneously herewith.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

disruption and loss of value, and further must be approved on an emergency basis in order to avoid immediate and irreparable harm to the Debtor's business and related operations.

**B.    Designation of Responsible Person.**

7.    I am the Debtor's Managing Member, and have worked in this capacity since the company was founded in 2014. As a result of the foregoing, I am readily familiar with the Debtor's finances and operations. Additionally, pursuant to the Debtor's corporate resolution authorizing it to file bankruptcy as attached to its *Voluntary Petition* [ECF No. 1] filed in this Chapter 11 Case, I was selected as a designated responsible person for the Debtor in its Chapter 11 Case, and this Motion seeks to implement the foregoing. Accordingly, I am suitable for serving as a designated responsible person on behalf of the Debtor in its Chapter 11 Case.

**C.    Utilities Motion.**

8.    In the ordinary course of operating the Debtor's business and the operation of its business and related amenities, the Debtor incurs utility expenses for electricity (NV Energy), natural gas (Southwest Gas), internet/cable (Cox Communications), telephone/voicemail (Cox Communications), which, as provided by in the Commercial Lease Agreement between the Debtor and its landlord, are all the Debtor's responsibility. These utility services are provided by the utilities (as such term is used in section 366 of the Bankruptcy Code, collectively, the "Utility Providers"), and inclusive of the foregoing utilities.

9.    On average, the Debtor expends approximately $1,176.00 in the aggregate and on average each month on utility costs. As of the Petition Date, the Debtor is current on all of its utility obligations owed to its utility providers, except for current accrued amounts that have not been billed as of yet in the middle of the applicable billing cycle.

10.    Preserving utility services on an uninterrupted basis is essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization. Any interruption of utility services, even for a brief period of time, would disrupt the Debtor's ability to continue maintaining its business, thereby negatively affecting customer relationships, revenues and profits. Such a result could jeopardize the Debtor's reorganization efforts and, ultimately, value and creditor recoveries. It is therefore critical that utility services continue uninterrupted during the Chapter

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

11 Case.

11. The Debtor intends to pay its post-petition utility obligations owed to the Utility Providers in a timely manner and keep them current on a go forward basis from and after the Petition Date. The Debtor expects that it will have access to such funds from operations to pay post-petition obligations to the Utility Providers. Given the relatively minor monthly obligations usually owing to Utility Providers as compared with the Debtor's cash flow generated from operations, which averages in excess of $471,250.00 gross per month, and the long account history spanning several years without issues, the Debtor asserts that there is no need to provide any additional assurance of payment for future services to the Utility Providers.

12. Notwithstanding the foregoing, if the Utility Providers are not satisfied that they have received adequate assurance of future payment, the Debtor proposes the following procedures (the "Procedures") under which such dissatisfied Utility Provider may make additional requests for adequate assurance:

    a. If a Utility Provider is actually served with the order approving this Motion, which service of the order shall be within two (2) days of its entry, is not satisfied with the assurance of future payment provided by the Debtor, the Utility Provider must serve a detailed written request (a "Request") so that it is *actually received* within twenty (20) days of the date of the entry of the order granting this Motion (the "Request Deadline") requesting what additional protections it believes are necessary and appropriate under the circumstances.

    b. Without further order of the Court, the Debtor may enter into agreements granting additional adequate assurance to a Utility Provider serving a timely Request if the Debtor, in its discretion, determines that the Request is reasonable or if the parties negotiate alternate consensual provisions.

    c. If the Debtor believes that a Request is unreasonable, the Debtor shall file a motion pursuant to section 366(c) of the Bankruptcy Code (a "Determination Motion") within fifteen (14) days after the Request Deadline. The Determination Motion shall seek a determination from the Court that the Utility Deposit account, plus any additional

4

consideration offered by the Debtor, constitutes adequate assurance of payment. Pending notice and a hearing of the Determination Motion, the Utility Provider that is the subject of the Determination Motion may not alter, refuse or discontinue services to the Debtor, or recover or set off against a prepetition deposit.

        d.     Any Utility Provider that is actually and timely served with the order approving this Motion that fails to make a timely Request shall be deemed to be satisfied that the Debtor's existing arrangements with them provides adequate assurance of payment to such Utility Provider within the meaning of section 366 of the Bankruptcy Code, and shall further be deemed to have waived any right to seek additional adequate assurance during the course of this Chapter 11 Case.

13.    The Debtor further requests that all Utility Providers be prohibited from altering, refusing, or discontinuing utility services to the Debtor absent further order of the Court.

14.    The Debtor will have sufficient resources to pay, and intends to pay, all valid post-petition utility obligations for utility services in a timely manner. In addition, the Debtor has a powerful incentive to stay current on its utility obligations because of the Debtor's reliance on utility services for the operation of its business. These factors, which the Court may (and should) consider when determining the amount of any adequate assurance payments, justify a finding that no adequate assurance payment is required in this Chapter 11 Case. In light of the foregoing, the Debtor respectfully submits that the existing arrangements for the Utility Providers are more than sufficient to assure the Utility Providers of future payment.

15.    Moreover, if a Utility Provider disagrees with the Debtor's analysis, the Procedures will enable the parties to negotiate and, if necessary, seek Court intervention without jeopardizing the Debtor's continuing operations. If a Utility Provider fails to timely file a Request in accordance with the Procedures, however, such Utility Provider should be deemed to consent to the Procedures and shall be bound by any order approving this Motion.

16.    The proposed Procedures are necessary for the Debtor to carry out its reorganization efforts. If such Procedures are not approved, the Debtor could be forced to address a volume of requests by its Utility Providers during the critical first weeks of its reorganization.

Moreover, the Debtor could be blindsided by a Utility Provider unilaterally deciding -- on or after the 30th day following the Petition Date -- that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service would force operations to cease, and such disruption of operations could place the Debtor's reorganization efforts in jeopardy.

17.     Accordingly, approval of the Debtor's utilities motion is in the best interests of the estate and all creditors and parties in interest.

D.     **Cash Management Motion.**

18.     To manage its business efficiently and seamlessly, the Debtor utilizes a cash management system (the "Cash Management System") to collect and transfer funds generated by its operations and disburse those funds to satisfy the obligations required to operate its business. The Cash Management System facilitates Debtor's cash monitoring, forecasting, and reporting. In connection with the Cash Management System, the Debtor proposes to maintain control over the administration of its Bank Accounts and at the Bank indicated herein.

19.     By its Motion, the Debtor requests (i) authority to continue to operate the Cash Management System, including to fund the operations of Debtor in the ordinary course of business, consistent with its prepetition practices, as modified herein, (ii) authority to honor certain prepetition obligations related to the use of the Cash Management System, and (iii) authority to maintain existing business forms.

20.     In the ordinary course of business prior to the Petition Date, the Debtor used the Cash Management System, which is similar to those utilized by other companies, to collect, transfer, and distribute funds generated by Debtor's business operations efficiently. In the ordinary course of business, the Debtor accurately recorded such collections, transfers, and disbursements as they were made. Currently, the Debtor has seven (7) bank accounts with Wells Fargo Bank (the "Bank") which accounts include: i) a payroll account; ii) three (3) operating accounts; iii) a savings account; iv) a checking overdraft; and v) an account for clients paying with Zelle (in Mr. Tapia's name) (the "Bank Accounts"). The Bank is on the list of authorized depositories promulgated by the Office of the United States Trustee for the District of Nevada.

21. Given the existing Cash Management System and the confusion and inefficiency that would be caused by trying to change it, the Debtor has determined to continue its prepetition cash management practices in the post-petition period to a large extent. The Debtor's Cash Management System constitutes ordinary course, essential business practices providing significant benefits to Debtor including, *inter alia*, the ability to (i) control corporate funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Any disruption of the Cash Management System could have a severe and adverse impact upon Debtor's value and reorganization effort.

22. The Debtor will maintain its books and records relating to the Cash Management System to the same extent the books and records were maintained before the Petition Date. In this way, all transfers and transactions will be properly documented, and accurate balances will be maintained. As a result, the Debtor will be able to accurately document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest. Based on the foregoing, the Debtor believes that maintenance of the existing Cash Management System is in the best interests of its estate, and all creditors and parties in interest. Therefore, the Debtor seeks authority to maintain and use its Cash Management System during its Chapter 11 Case.

23. The relief requested in this Motion is also necessary because many debtors in possession run into significant challenges post-petition trying to open up new DIP accounts at a financial institution, even if that institution is on the authorized depositories list, when there is no pre-existing, pre-petition banking relationship with the Debtor as a customer. Additionally, the language requested in this Motion and proposed form of order is specifically required by the Bank per its Deposits Bankruptcy department, and indeed the Bank will maintain a freeze on the Bank Accounts unless and until an appropriate form of cash management order is entered.

24. In connection with its use of the Cash Management System, the Debtor incurs periodic service charges and other fees to the Bank for the maintenance of the Cash Management System (the "Service Charges"). For example, the Debtor's cash receipts are regularly deposited and a fee is required for such counting given its business. The Debtor is unaware of any unpaid

prepetition Service Charges as of the Petition Date; however, out of abundance of caution, the Debtor requests authority to pay the prepetition Service Charges to the Bank, if any, that remain unpaid as of the Petition Date.

25.  Payment of the prepetition Services Charges is in the best interests of the Debtor, its estate and all parties in interest as it will prevent any disruption to the Cash Management System. Additionally, because the Bank has setoff rights with respect to the Service Charges, payment of any prepetition Service Charges would not affect unsecured creditors and the issue of paying any prepetition Service Charges would just be a matter of timing.

26.  As part of the Cash Management System, the Debtor maintains numerous Bank Accounts. The Debtor routinely deposits and withdraw funds from the Bank Accounts by checks, wire transfers, and automated clearinghouse transfers. Rigid adherence to the U.S. Trustee's "Operating Guidelines and Reporting Requirements For Debtors in Possession and Trustees" (the "<u>Guidelines</u>") would require, as of the Petition Date, the closure of Debtor's prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtor in Possession" designation on them. The Debtor believes, however, that its transition to chapter 11 will be smoother, less costly, and more orderly, and disruption and harm to its Cash Management System will be minimized, if the Bank Accounts are continued following the commencement of its case with the same account numbers; *provided*, *however*, that checks issued or dated prior to the Petition Date will not be honored absent a prior order of the Court.

27.  Unless otherwise ordered by this Court, the Bank shall not honor or pay any check issued on account of a prepetition claim. The Bank may honor any checks issued on account of prepetition claims only where this Court has specifically authorized such checks to be honored, such as pursuant to the separately filed motion regarding the payment of employee wages and independent contractor payments. Furthermore, notwithstanding anything to the contrary in any other emergency and interim order or other order of this Court, the Debtor requests that the Bank be authorized to accept and honor all representations from the Debtor as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Petition Date. The Debtor further requests that the Bank

should not be liable to any party for following the Debtor's instructions or representations regarding which checks should be honored.

28. By preserving business continuity and avoiding disruption and delay to the Debtor's disbursement obligations, including payroll, that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best-served. The confusion that would otherwise result, absent the relief requested herein, would ill-serve Debtor's rehabilitative efforts.

29. Accordingly, the Debtor requests authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in a manner consistent with prepetition practices, and to pay any ordinary course bank fees that may be incurred in connection with the Bank Accounts or any other new bank account that may be opened pursuant to an order of this Court following the Petition Date.

30. In addition, to minimize expenses, the Debtor further requests that it be authorized to continue to use its existing check stock. Because all of the Debtor's payments were made out of its bank accounts at the Bank, to the extent they use those bank accounts for payroll and vendor payments, it is requesting to continue to use such check stock; *provided, however*, that the Debtor shall commence marking "Debtor in Possession" and the chapter 11 case number on its own existing check stock and wire transfer instructions instead of having new stock printed with such marking.

31. If the Debtor is not permitted to maintain and utilize its current Bank Accounts and its existing check stock, the resultant prejudice will include significant (i) disruption to the Debtor's ordinary financial affairs and business operations, (ii) delay in the administration of Debtor's estate, and (iii) cost to the estate to set up new systems, open new accounts, print new business forms, and print new checks.

32. Accordingly, approval of the Debtor's cash management motion is in the best interests of the estate and all creditors and parties in interest.

I declare under penalty of perjury of the laws of the United States that these facts are true

9

to the best of my knowledge and belief.

DATED: September 16, 2022.

/s/Carlos Tapia
CARLOS TAPIA